**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

RENITA REED, on behalf of herself and all others similarly situated,

Plaintiff,

vs.

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER,

Defendant

Case No: 3:26-cv-00532-HTW-LGI

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiff Renita Reed ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant University of Mississippi Medical Center, ("Defendant" or "UMMC"). Plaintiff seeks to obtain damages, restitution, and injunctive relief for the Class, as defined below, from UMMC. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## INTRODUCTION

1. This class action arises out of the recent targeted cyberattack and data breach on UMMC's network that resulted in unauthorized access to highly sensitive patient and employee data. Plaintiff brings this class action against UMMC for its failure to secure and safeguard hundreds of thousands of individuals' personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Private Information"). As a result, Plaintiff and Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the

effects of the attack, emotional distress, and the imminent risk of future harm caused by the compromise of their sensitive personal information.

2. UMMC is the health sciences campus of the University of Mississippi. It houses seven health science schools and operates seven hospitals, 35 medical clinics, and more than 200 telehealth sites throughout Mississippi. UMMC facilities see tens of thousands of patients each year and is one of the largest employers in Mississippi, employing more than 10,000 people.

3. As a condition of receiving medical services, UMMC's patients are required to provide sensitive and private information, including PII and PHI. Similarly, UMMC employees are required to provide it with certain non-public information. In both scenarios, UMMC assumed a duty to reasonably safeguard this sensitive information with which it is entrusted.

4. UMMC failed to do so here. On or around February 19, 2026, UMMC discovered that its systems were subject to a cybersecurity attack, which resulted in unauthorized access to Plaintiff's and Class Members' Private Information (the "Data Breach" or "Breach").

5. As a result of the Data Breach, UMMC's IT systems were disrupted or disabled, including phone systems, email capabilities, and access by UMMC healthcare professionals and personnel to electronic medical records. Because of this, UMMC closed all 35 of its clinic locations from February 19 through March 1, 2026.

6. Because UMMC's website was down during the cyberattack, UMMC provided updates to the public via its Facebook page. Their updates stated, in relevant part, "Due to a cybersecurity attack, many UMMC IT systems are down, including access to our electronic medical records, Epic. Today, all UMMC clinic locations statewide are closed. Outpatient and

ambulatory surgeries/procedures and imaging appointments are cancelled and will be rescheduled."[1] UMMC also stated "We expect this to be a multi-day event[.]"[2]

7. UMMC's Facebook posts did not disclose the nature of the cybersecurity attack, how it discovered the cybersecurity attack, the means and mechanisms of the cybersecurity attack, or what kind of sensitive Private Information was compromised.

8. The Data Breach was a direct result of UMMC's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' PII and PHI from the foreseeable thread of a cyberattack.

9. By taking possession and control of Plaintiff's and Class Members' Private Information for its own pecuniary benefit, UMMC assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' Private Information against unauthorized access and disclosure. UMMC also had a duty to adequately safeguard this Private Information under industry standards and duties imposed by statutes, including HIPAA regulations and Section 5 of the Federal Trade Commission Act ("FTC Act"). UMMC breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' and other individuals' Private Information from unauthorized access and disclosure.

10. The exposure of a person's PII and PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of that person's life. As a result of

---

[1] University of Mississippi Medical Center, FACEBOOK (Feb. 19, 2026, at 8:45 AM CT), https://www.facebook.com/share/p/1DTzZv4QUd/.

[2] University of Mississippi Medical Center, FACEBOOK (Feb. 19, 2026, at 3:26 PM CT), https://www.facebook.com/share/p/1K5aEtRN4C/.

the Data Breach, Plaintiff and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private Information in the coming years, including but not limited to, unauthorized access to email accounts, tax fraud, and identity theft—including medical identity theft.

11. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take several additional prophylactic measures.

12. There has been no assurance offered by UMMC that all impacted Private Information or copies thereof have been recovered or destroyed.

13. As a result of UMMC's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff and Class Members suffered injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their Private Information from its exposure, emotional distress, and the present and imminent risk of fraud and identity theft caused by the compromise of their sensitive Private Information. Plaintiff's and Class Members' sensitive Private Information—which was entrusted to UMMC, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

14. Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiff's and Class Members' sensitive and confidential Private Information still remains in the possession of UMMC. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

15. UMMC disregarded the rights of Plaintiff and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against

unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII/PHI of patients and other individuals; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to properly train its staff and employees on proper security measures.

16. In addition, UMMC and its employees failed to properly monitor the computer network and systems that housed the Private Information entrusted to it. Had UMMC properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

17. The security of Plaintiff's and Class Members' identities is now at risk because of UMMC's wrongful conduct as the Private Information that UMMC collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

18. As a result of the Data Breach, Plaintiff and Class Members have been exposed to actual and/or a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now closely monitor their financial accounts to guard against further fraud and identity theft, potentially for the rest of their respective lives.

19. Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

20. Plaintiff and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft. Due to the fact that the exposed information potentially includes Social Security numbers ("SSNs") and other immutable personal details, Plaintiff and Class Members will be at risk of identity theft and fraud that will persist throughout the rest of their lives.

21. Furthermore, UMMC is obligated under the HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, to notify the U.S. Department of Health and Human Services ("HHS") of any data breach affecting more than 500 individuals within 60 days of the breach. As of the filing of this Complaint—more than four months following discovery of the breach—UMMC has failed to do so, in violation of federal law.

22. In addition to the damages caused by the Data Breach, UMMC closed all 35 of its medical clinics from February 19 through March 1, 2026 and cancelled all non-emergency procedures as it attempted to gain control of the situation.

23. According to UMMC's Facebook updates, all outpatient and ambulatory surgeries and procedures and imaging appointments were cancelled for at least 11 days. Potentially thousands of patients suffered delays in medical treatment because UMMC inadequately protected their Private Information and lost control of its electronic medical record system.

24. Plaintiff brings this action individually and on behalf of individuals in the United States whose Private Information was exposed as a result of the Data Breach, as well as individuals who had medical appointments cancelled by UMMC as a result of the Data Breach. Plaintiff and Class Members seek to hold UMMC responsible for the harms resulting from the massive and preventable disclosure of such sensitive Private Information and the harms resulting from cancelled medical appointments and delays in treatment. Plaintiff seeks to remedy all of these harms resulting from the Data Breach on behalf of herself and all similarly situated individuals whose Private Information was accessed and exfiltrated during the Data Breach, and/or whose medical appointments were cancelled.

25. Plaintiff served a Notice of Claim letter on Defendant on April 10, 2026, pursuant to the Mississippi Tort Claims Act (Miss. Code § 11-46-11), and received no response.

26. Plaintiff thus seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and declaratory and injunctive relief including improvements to UMMC's data security systems, future annual audits, and adequate credit monitoring services funded by UMMC.

## PARTIES

***Plaintiff Renita Reed***

27. Plaintiff Renita Reed is, and at all times mentioned herein was, an individual citizen of the State of Mississippi, residing in Rankin County.

28. Plaintiff Reed is a current patient of UMMC and has been since approximately 1989. Plaintiff visits UMMC at least once a year and last visited UMMC in or around June 2025.

29. As a requirement of receiving medical services from UMMC, Plaintiff Reed provided Defendant with substantial amounts of her Private Information.

30. On or around February 20, 2026, Plaintiff Reed received an email from Defendant UMMC alerting Plaintiff that all UMMC clinic locations were closed due to a system network outage.

31. Upon information and belief, Plaintiff Reed's Private Information was subject to the Data Breach.

32. Plaintiff Reed would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

33. Upon information and belief, Plaintiff Reed suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

34. Plaintiff Reed suffered actual injury in the form of damages to and diminution in the value of her personal and health information – a form of intangible property that Plaintiff Reed entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

35. Plaintiff Reed suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

36. Plaintiff Reed has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendant's systems have already been shown to be susceptible to compromise and are subject to further attack so long as UMMC fails to undertake the necessary and appropriate security and training measures to protect its patients' Private Information.

37. Plaintiff Reed has suffered anxiety as a result of the unauthorized release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Reed is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

38. Plaintiff Reed also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Reed; (b)

violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

***Defendant UMMC***

39. Defendant UMMC is the health sciences campus of the University of Mississippi with its principal place of business at 2500 N. State Street in Jackson, Mississippi. It houses seven health science schools and operates seven hospitals, 35 medical clinics, and more than 200 telehealth sites throughout Mississippi.

40. UMMC has over 10,000 employees, enrolls over 3,000 students, and sees over 70,000 patients every year.

## JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and there are numerous Class Members who are citizens different states from Defendant.

42. This Court has personal jurisdiction over the parties in this case. Defendant UMMC conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

43. Venue is proper in this District under 28 U.S.C. §1391(b) because UMMC and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. UMMC's Business

44. Since 1955, UMMC has provided patients with a comprehensive range of medical services encompassing all areas of medicine including trauma and emergency care, transplant

programs, cancer care, cardiac care, and neuroscience. UMMC is Mississippi's largest hospital system and one of Mississippi's largest employers.

45. As a condition of providing medical care UMMC requires that its patients entrust it with Private Information. On information and belief, in the ordinary course of medical care and medical billing, UMMC maintains the Private Information of patients and customers, including but not limited to names, addresses, phone numbers, email addresses, dates of birth, demographic information, Social Security numbers, financial information, medical histories, medical providers, medication information, health insurance information, photo identification, employment information, and any other information that UMMC may deem necessary to provide care.

46. Additionally, UMMC may receive Private Information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, patients' other doctors, patients' health plan(s), close friends, and/or family members.

47. UMMC acknowledges the highly sensitive and personal nature of the information it acquires, receives, creates, and stores, and, in its Privacy Notice, promises that it is "committed to safeguarding your privacy" and that it will "comply with legal requirements" regarding the information it collects about its patients and customers.[3] UMMC also declares, "As an academic medical center and health care provider, we value the trust you place in us," and claims to "use[] reasonable measures to protect your personal information."[4] Moreover, in its Notice of Privacy

---

[3] *UMMC Website Privacy Notice*, UNIV. OF MISS. MED. CTR., https://www.umc.edu/Information-Security-Privacy/notices/web.html (last accessed Feb. 23, 2026).

[4] *Id.*

Practices, UMMC states that, "In the event your unsecured protected health information is breached, we will notify you of the occurrence."[5]

48. As a HIPAA covered business entity, UMMC is required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

49. However, UMMC did not maintain adequate security to protect its systems from infiltration by cybercriminals.

50. Plaintiff and Class Members include patients and clients of UMMC, students at UMMC, and individuals with a potential or actual employment relationship, all of whom entrusted UMMC with their Private Information.

**B. UMMC Is a HIPAA Covered Entity**

51. UMMC is a HIPAA covered entity that provides healthcare services. As a regular and necessary part of its business, UMMC collects and custodies the highly sensitive PII and PHI of its patients and health plan Members. UMMC is required under federal and state law to maintain the strictest confidentiality of the patient's Private Information that it requires, receives, and collects, and UMMC is further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties.

52. As a HIPAA covered entity, UMMC is required to ensure that it will implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including

[5] *Notice of Privacy Practices (HIPAA)*, UNIV. OF MISS. MED. CTR., https://www.umc.edu/Information-Security-Privacy/notices/hipaa-notice.html (last accessed Feb. 20, 2026).

by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

53. Due to the nature of UMMC's business, which includes providing medical services across all areas of medicine, UMMC would be unable to engage in its regular business activities without collecting and aggregating Private Information that it knows and understands to be sensitive and confidential.

54. By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, UMMC assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

55. Plaintiff and Class Members are or were patients whose medical records and personal information were maintained by, or who received health-related or other services from, UMMC; current or former employees of UMMC; and/or current or former students of UMMC, all of whom directly or indirectly entrusted UMMC with their Private Information.

56. Plaintiff and the Class Members relied on UMMC to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and health care purposes, and to prevent the unauthorized disclosures of the Private Information. Plaintiff and Class Members reasonably expected that UMMC would safeguard their highly sensitive information and keep their Private Information confidential.

57. As described throughout this Complaint, UMMC did not reasonably protect, secure, or store Plaintiff's and the Class's Private Information prior to, during, or after the Data

Breach, but rather, enacted unreasonable data security measures that it knew or should have known were insufficient to reasonably protect the highly sensitive information UMMC maintained. Consequently, cybercriminals circumvented UMMC's security measures, resulting in a significant data breach.

**C. The Data Breach**

58. According to posts to UMMC's Facebook account—through which UMMC communicated with the public once UMMC's website was taken offline due to the Data Breach—UMMC was subject to a cybersecurity attack on or around February 19, 2026.[6]

59. UMMC did not provide any details about how it discovered the breach, but at a news conference on February 19, 2026, an official stated that the attack "impacts all medical center locations"[7] and has affected "many systems" including its electronic health record platform.[8]

60. Moreover, reporting indicates that the data breach "has impacted the UMMC network and many of its IT systems, including its EPIC electronic medical record system."[9] As a result of the Data Breach, "information is being recorded with pen and paper for patients in its care."[10]

---

6 *See* FACEBOOK, *supra* note 1.

7 *See* Lauren Witte, *UMMC Holds Press Conference On Cyberattack, Says FBI Is Assisting the Investigation*, CLARION LEDGER (Feb. 19, 2026), https://www.clarionledger.com/picture-gallery/news/2026/02/19/cyberattack-university-of-mississippi-medical-center-fbi-ummc-speaks-jackson-ms/88759752007/.

8 *See* Sophie Bates, *Mississippi Hospital System Closes All Clinics After Ransomware Attack*, ASSOCIATED PRESS (Feb. 20, 2026, at 7:49 PM CST), https://apnews.com/article/cyberattack-university-mississippi-clinics-hospital-4b27a578a5e095c5a7d25c90768a5312.

9 Steve Adler, *UMMC Shuts Clinics While It Grapples With Ransomware Attack*, THE HIPAA J. (Feb. 20, 2026), https://www.hipaajournal.com/ummc-ransomware-attack/.

10 *Id.*

61. Furthermore, reporting about the Data Breach indicates that "[w]ith UMMC being the state's largest hospital, the impact could extend far beyond Jackson. Patient information in clinics across Mississippi could be at risk."[11] A cybersecurity expert consulted about the incident stated "They're going after their demographic data most of the time. So they can have billing records, social security numbers, all of that they can use elsewhere to, you know, change their identity, steal your identity," and has advised people to check their bank accounts.[12]

62. As a HIPAA covered entity that collects, creates, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk of which UMMC was aware and knew it had a duty to guard against. This is particularly true because the targeted attack was a ransomware attack. It is well-known that healthcare businesses such as Defendant, which collect and store the confidential and sensitive patient PII/PHI, are frequently targeted by ransomware attacks. Further, ransomware attacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training. In fact, the vast majority of ransomware incidents are caused by a combination of poor user practices, lack of cybersecurity training, and/or weak passwords or access management.[13]

63. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiff and Class Members.

---

[11] *See* Quentin Smith, Holly Emery & Emma Nisbet, *UMMC Confirms Cyberattack, Closing Clinics and Canceling Surgeries*, WLBT (Feb. 19, 2026), https://www.wlbt.com/2026/02/19/sources-say-ummc-suffers-cyber-attack/.

[12] *Id*.

[13] *Most Common Delivery Methods and Cybersecurity Vulnerabilities Causing Ransomware Infections According to MSPs Worldwide as of 2020*, STATISTA, https://www.statista.com/statistics/700965/leading-cause-of-ransomware-infection/ (last accessed Feb. 24, 2023).

64. Due to UMMC's inadequate security measures and its delayed notice to victims, Plaintiff and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

65. Upon information and belief, and based on the type of cyberattack, along with public news reports, it is plausible and likely that Plaintiff's Private Information was stolen in the Data Breach.

66. UMMC had obligations created by HIPAA, contract, industry standards, common law, and its own promises and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

67. Plaintiff and Class Members provided their Private Information to UMMC with the reasonable expectation and mutual understanding that UMMC would comply with its obligations to keep such information confidential and secure from unauthorized access.

68. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, UMMC assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

69. UMMC's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the Breach.

70. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members would not have allowed UMMC or anyone in UMMC's position to receive their Private Information had they known that UMMC would fail to implement industry standard protections for that sensitive information.

71. As a result of UMMC's negligent and wrongful conduct, Plaintiff's and Class Members' highly confidential and sensitive Private Information was left exposed to cybercriminals.

**D. UMMC Cancelled Hundreds of Patients' Medical Appointments Due to the Breach**

72. After discovering the Data Breach, which affected access to UMMC's entire electronic medical record system, UMMC closed all 35 of its clinic locations from at least February 19 through March 1, 2026.

73. UMMC's initial announcement of the Data Breach stated, "Outpatient and ambulatory surgeries/procedures and imaging appointments are cancelled and will be rescheduled."[14]




74. UMMC later announced, "UMMC clinics statewide will again be closed tomorrow, Friday, Feb. 20, and elective procedures are cancelled. Appointments will be rescheduled."[15]

---

[14] University of Mississippi Medical Center, FACEBOOK (Feb. 19, 2026, at 8:45 AM CT), https://www.facebook.com/share/p/1BwxV54xY8/.

[15] University of Mississippi Medical Center, FACEBOOK (Feb. 19, 2026, at 3:26 PM CT), https://www.facebook.com/share/p/1K5aEtRN4C/.



University of Mississippi Medical Center
23h

We continue to work with federal authorities and national experts in cyberattack response as we evaluate the extent of the attack and our next steps. We expect this to be a multi-day event and will communicate helpful information, when available.

UMMC clinics statewide will again be closed tomorrow, Friday, Feb. 20, and elective procedures are cancelled. Appointments will be rescheduled. One exception is the dialysis clinic at the Jackson Medical Mall, which is operational and open for scheduled appointments.

UMMC hospitals and Emergency Departments will remain open the duration of this incident unless we communicate otherwise.

In-person classes remain as scheduled, but online classes are cancelled for tomorrow.

We are sorry for this disruption, and we are working diligently to restore our systems and services as soon as possible.

820 175 649

75. On Saturday, February 21, UMMC announced that all of its clinics would remain closed on February 23 and 24, 2026.



University of Mississippi Medical Center
February 21 at 6:32 PM

Feb. 21, 2026

Medical Center teams continue to respond to the impact of our recent cyberattack alongside federal and state agencies and experts in cybersecurity.

Clinics statewide will be closed on Monday, Feb. 23 and Tuesday, Feb. 24, and elective procedures on those days are cancelled. Appointments will be rescheduled when possible.

UMMC hospitals and Emergency Departments in Jackson, Grenada, Madison County and Holmes County remain open.

We apologize for this continued disruption of access to our services.

508 241 comments 439 shares

76. According to a UMMC official, "An elective procedure is something that is scheduled that does not require a lifesaving intervention. So for example, if you're coming to see a doctor about your knee pain, that's gonna [sic] be cancelled."[16]

[16] *See* Lauren Witte, *UMMC Holds Press Conference On Cyberattack, Says FBI Is Assisting the Investigation*, CLARION LEDGER (Feb. 19, 2026, at 12:45 PM CT), https://www.clarionledger.com/picture-gallery/news/2026/02/19/cyberattack-university-of-mississippi-medical-center-fbi-ummc-speaks-jackson-ms/88759752007/.

77. However, the clinics' mass closure affects far more than those with "knee pain" and the like. One UMMC lymphoma patient told reporters that he drove three hours to his medical provider only to learn that his chemotherapy treatment was cancelled, and that he was unable to immediately reschedule his appointment.[17]

78. UMMC patients have been sharing their concerns on UMMC's Facebook page, usually with no response from UMMC. For example, the following comments were completely ignored by UMMC.




[17] Sophie Bates, *Mississippi Hospital System Closes All Clinics After Ransomware Attack*, ASSOCIATED PRESS (Feb. 20, 2026, at 7:49 PM CST), https://wreg.com/health-3/ap-health/ap-mississippi-hospital-system-closes-all-clinics-after-ransomware-attack/.

**Shonda Williams**
**University of Mississippi Medical Center** my son had surgery and a skin graft done and has a follow up appointment with the burn specialist Monday Feb 23 at the batson clinic. no one has contacted me to say one way or the other about if this is going to affect his appointment will it?
1d Like Reply Edited

**Ashly Nichole**
**Shonda Williams** most likely. I had a skin graft too and I cannot get any info on what to do. I can't even get help to tell if im having any complications
1d Like Reply

**Shonda Williams**
**Ashly Nichole** IV tried calling and nothing.. IV tried emailing the doctor from my chart but I can't even get into my chart and I'm not 100% sure if he's having complications either but to me I would think it shouldn't still be bleeding and have almost like blister like open areas still. also he's been out of school but on the 23rd that's when his doctor's excuses up so I don't know at this point 🤷

**Chuck Rogers**
Any idea how the rescheduling is going to be handled? My granddaughter waited three months to get in for a test she needs badly. Will these cancellations be given any priority to reschedule?

**Mia Szymanski Bennett**
Does anybody know if the pavilion (specifically maternal fetal medicine) is closed? Not sure if that's considered part of the hospital or a clinic.

**Patsy Clark**
I have an upcoming appointment at UMMC, with my oncologist. I sure hope that it doesn't get canceled.

**Kellie King Hartzog**
Do we know if the clinics will be open any this week? I have a 8yr old daughter that was supposed to get her cast off her leg Tuesday. And I can't get in touch with anyone.

**Rila Hall**
How does a cancer patient get a refill?

**Kilee Ezell Smith**
What about pain management patients waiting for scripts to be sent in so they can be refilled
1h Like Reply

**Joy Butorsky**
I'm waiting for a hysterectomy 6 week post op appointment. Appointment was for today. Need ideas on how to get checked. And need a release letter so I can get back to work.
2h Like Reply

**Faith Black Stuart**
I need a Trympia injection from UMMC Specialty Pharmacy. How can I get that? I really don't want to miss my schedule.

**Ryan Meadows**
My surgeon told me to get up with him if my pain came back or if I lost feeling in my leg like before surgery which the pain came back and my leg is currently numb. Came to the er Friday because of the pain and they sent me out with prescriptions and told me to try later just wondering what to do??

**Heather LeShae**
What about the ones needing to contact Dr to get meds refilled? How do you go about that? I can't even get through to the dr to get my child's meds refilled and they are a very crucial med that he needs

**Jennifer Ducksworth Barnes**
My husband has a appointment with DR Earl on Monday at the clinic and no one has called to canceled in Jackson
1d Like Reply

**Emily Helm**
**Jennifer**, they cannot call you to cancel because the phone lines are down at the hospital, and Epic, the electronic medical record system, is completely down. These posts unfortunately have to serve as the cancelation notice.
1d Like Reply

**Brenda Smith**
On 2/25/26 @ 1:15, I have appointment with clinic then CT Lung Screening in UMMC/Ridgeland. Do I go, or will it be rescheduled?

**Paige Ketchum**
Noooooooooo....I've been waiting on my son's ent appointment all month 😩

**Shelettie Brown**
We have appointment on Monday at 8 o'clock at the children clinic do we come are it's canceled

**Angela Monahan Murphy**
Breast cancer surgery isn't an elective. What are we to do?

**Willetta Campbell**
What are people who are on medications that have to be refilled every month do?? No one wants to be going through withdrawals. There has to be something yall can do??

**Amanda Lee Turner-Kreutzer**
What happened to having a "Backup Plan!?" This is now getting ridiculous!!
There actually are patients that need to be seen by their physicians. What has happened to the old days where "Paper charts are or can be used for patient care""!!??"
Come on **University of Mississippi Medical Center** You guys have to do Better then what your doing!! 👎👎

**Ashly Nichole**
**UMMC Surgery** what should surgery follow up patients do? I have had stitches and staples in almost 2 weeks on my left bend area of the knee. I had a skin graft done.. I need to know what to do




79. The clinic closures have caused dangerous delays in medical treatment for all types of patients, including cancer patients and patients in severe pain. This risk to their health and their lives is directly attributable to UMMC's failures that led to the Data Breach.

80. As an additional result of the Data Breach, UMMC's phone systems were also disabled, leaving patients unable to contact UMMC to learn whether their appointments had been cancelled and unable to reschedule their appointments.

81. In addition to their Private Information being compromised by the Data Breach, Class Members whose appointments have been cancelled have also been harmed by additional and more immediate injuries.

**E. UMMC Was Previously Held Liable for a Similar Data Breach**

82. UMMC was fully aware of its vulnerability to bad actors breaching its systems and stealing its patients', employees', and others' sensitive PII and PHI because it was held liable for a similar cyberattack in 2013.

83. According to HHS, in March of 2013, UMMC became aware of a potential security breach when it determined that a laptop had been stolen by a visitor from its Medical Intensive Care Unit.[18]

84. In its investigation of the incident, HHS's Office for Civil Rights ("OCR") determined that PHI stored on UMMC's network was vulnerable to unauthorized access because anyone using a generic username and password to access UMMC's wireless network could access an active directory containing 67,000 files, including files containing the PHI of an estimated 10,000 patients.[19]

85. OCR concluded that "UMMC was aware of risks and vulnerabilities to its systems as far back as April 2005, yet no significant risk management activity occurred until after the breach, due largely to organizational deficiencies and insufficient institutional oversight."[20]

86. Furthermore, OCR determined that UMMC failed to:

- "implement its policies and procedures to prevent, detect, contain, and correct security violations;
- implement physical safeguards for all workstations that access ePHI to restrict access to authorized users;
- assign a unique username and/or number for identifying and tracking user identity in information systems containing ePHI; and

[18] *Multiple Alleged HIPAA Violations Result in $2.75 Million Settlement with the University of Mississippi Medical Center (UMMC)*, U.S. DEP'T OF HEALTH & HUM. SERVS. (July 21, 2016), https://www.hhs.gov/hipaa/for-professionals/compliance-enforcement/agreements/ummc/index.html (last visited July 9, 2026).

[19] *Id*.

[20] *Id*.

- notify each individual whose unsecured ePHI was reasonably believed to have been accessed, acquired, used, or disclosed as a result of the breach."[21]

87. Especially in light of the 2013 breach and OCR's resulting investigation, UMMC was fully informed of its duty to safeguard patients', employees' and others' Private Information, as well as its vulnerability to being targeted for a data security breach.

88. Despite being subjected to a full investigation, a monetary fine in the millions, and clear corrective and preventative directives from OCR, UMMC still failed to make adequate security improvements to prevent the data breach complained of herein.

**F. UMMC Failed to Comply with FTC Guidelines**

89. UMMC was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

90. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

91. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer

[21] *Id.*

networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

92. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[24]

93. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

94. These FTC enforcement actions include actions against healthcare providers and partners like UMMC. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that

---

[22] *See Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[23] *Id.*

[24] *Id.*

LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

95. UMMC failed to properly implement basic data security practices.

96. UMMC's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

97. UMMC was at all times fully aware of the obligation to protect the Private Information of customers and patients. UMMC was also aware of the significant repercussions that would result from its failure to do so.

**G. UMMC Failed to Comply with Industry Standards**

98. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

99. Several best practices have been identified that at a minimum should be implemented by healthcare providers like UMMC, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

100. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

101. UMMC failed to meet the minimum standards of any of the following frameworks:

the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

102. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and UMMC failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**H. UMMC Violated its HIPAA Obligations to Safeguard Private Information**

103. UMMC is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

104. UMMC is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[25] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

105. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

---

[25] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

106. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

107. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

108. HIPAA's Security Rule requires UMMC to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

109. HIPAA also requires UMMC to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, UMMC is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

110. HIPAA and HITECH also obligated UMMC to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

111. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires UMMC to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[26]

112. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

113. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

114. HIPAA also requires the OCR, within HHS, to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[27] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry

---

[26] *See* Breach Notification Rule, U.S. DEP'T HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited July 9, 2026).

[27] *Id.*

standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[28]

115. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that HHS create rules to streamline the standards for handling PII like the data UMMC left unguarded. HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

116. A Data Breach, such as the one UMMC experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40

117. The Data Breach resulted from a combination of insufficiencies that demonstrate UMMC failed to comply with safeguards mandated by HIPAA regulations.

## I. UMMC Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information

118. In addition to its obligations under federal and state laws, UMMC owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. UMMC owed a duty

[28] Guidance on Risk Analysis, U.S. DEP'T HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited July 9, 2026).

to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

119. UMMC owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

120. UMMC owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

121. UMMC owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

122. UMMC owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

123. UMMC owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

124. UMMC owes a legal duty to secure its patients' PII and PHI and to timely notify them in the event of a data breach.

125. UMMC breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. UMMC's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e. Failing to detect unauthorized ingress into its systems;

f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

g. Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

h. Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

i. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

j. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

k. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

l. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

m. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

n. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

o. Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

p. Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of

its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

q. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

r. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

s. Failing to adhere to industry standards for cybersecurity as discussed above; and

t. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

126. UMMC negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

127. Had UMMC remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, UMMC could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII and PHI.

128. However, due to UMMC's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with UMMC.

**J. UMMC Knew or Should Have Known that Criminals Target Private Information**

129. UMMC's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the Breach.

130. At all relevant times, UMMC knew, or should have known, its patients', Plaintiff's, and all other Class Members' Private Information was a target for malicious actors. Despite such knowledge, UMMC failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyber-attacks that UMMC should have anticipated and guarded against.

131. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients like Plaintiff and Class Members.

132. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[29]

133. The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[30]

---

[29] Dissent, *Protenus releases the 2022 Breach Barometer report on health data breaches: More than 50 million affected*, DATABREACHES.NET (Mar. 10, 2022), https://databreaches.net/2022/03/10/protenus-releases-the-2022-breach-barometer-report-on-health-data-breaches-more-than-50-million-affected/ (last visited July 9, 2026).

[30] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, CYBERSECURITY NEWS (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited July 9, 2026).

134. Further, a 2022 report released by IBM Security states that, for 12 consecutive years, the healthcare industry has had the highest average cost of a data breach and as of 2022 healthcare data breach costs have hit a new record high.[31]

135. Private Information is a valuable property right.[32] The value of Private Information as a commodity is measurable.[33] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[34] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[35] Private Information is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

136. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, Private Information, and other

---

[31] *IBM Report: Consumers Pay the Price as Data Breach Costs Reach All-Time High*, IBM SEC. (July 27, 2022), https://newsroom.ibm.com/2022-07-27-IBM-Report-Consumers-Pay-the-Price-as-Data-Breach-Costs-Reach-All-Time-High (last visited July 9, 2026).

[32] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. & COMM'N TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]") (last visited July 9, 2026).

[33] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited July 9, 2026).

[34] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited July 9, 2026).

[35] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited July 9, 2026).

sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

137. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[36]

138. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[37] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[38] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[39]

---

36 *See How We Can Help You*, FBI, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited July 9, 2026).

37 *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAG (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.") (last visited July 9, 2026).

38 *Id.*

39 *See* Elinor Mills, *Study: Medical Identity Theft Is Costly For Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited July 9, 2026).

139. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[40] According to a report released by the FBI Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[41]

140. According to an article in the HIPAA Journal, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[42]

141. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[43]

---

40 Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited July 9, 2026).

41 *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited July 9, 2026).

42 Steve Alder, *Why Do Criminals Target Medical Records?*, HIPAA J. (Jan. 10, 2026), https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited July 9, 2026).

43 *Id.*

142. Moreover, patient records, like those stolen from UMMC, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[44]

143. Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[45] Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion…By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[46]

144. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[47]

---

44 *Id.*

45 Andrew Steger, *supra* note 37.

46 *Id.*

47 Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.heinz.cmu.edu/~acquisti/papers/acquisti-onlinepurchasing-privacy.pdf (last visited July 9, 2026).

145. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

146. Indeed, cyberattacks against the healthcare industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[48]

147. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, entities like and hospitals are attractive to ransomware criminals because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[49]

148. In fact, according to the cybersecurity firm Mimecast, by mid-2025 54% of healthcare organizations had reported ransomware attacks.[50]

149. UMMC was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them.

---

[48] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited July 9, 2026).

[49] Jenni Bergal, *Ransomware Attacks on Hospitals Put Patients at Risk*, STATELINE (May 18, 2022), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2022/05/18/ransomware-attacks-on-hospitals-put-patients-at-risk (last visited July 9, 2026).

[50] *Key Ransomware Statistics for Organizations (Updated July 2025)*, MIMECAST, https://www.mimecast.com/content/ransomware-statistics/ (last visited July 9, 2026).

The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[51]

150. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[52]

151. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiff and Class Members.

152. UMMC was on notice that the federal government has been concerned about healthcare company data encryption practices. UMMC knew its employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

153. The OCR urges the use of encryption of data containing sensitive personal information. As far back as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In

---

[51] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited July 9, 2026).

[52] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited July 9, 2026).

announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated in 2014 that "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[53]

154. As a HIPAA covered business associate, UMMC should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in its unprotected files.

**K. Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft**

155. Cyberattacks and data breaches at healthcare companies like UMMC are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

156. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[54]

157. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[55]

---

53 *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T HEALTH & HUM. SERVS. (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html (last visited July 9, 2026).

54 Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited July 9, 2026).

55 Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 HEALTH SERVS. RSCH. 971, 971-980 (2019), available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited July 9, 2026).

158. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[56]

159. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

160. Theft of Private Information is serious. The FTC warns consumers that identity thieves use Private Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.

161. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit

---

[56] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited July 9, 2026).

bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[57]

162. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

163. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

164. Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[58]

165. Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or

---

[57] *See IdentityTheft.gov*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited July 9, 2026).

[58] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009), https://scholarship.richmond.edu/jolt/vol15/iss4/2/ ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited July 9, 2026).

health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[59]

166. Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

167. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the Private Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

168. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[59] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last accessed July 9, 2026).

169. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

170. For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

171. Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[60]

172. Social security numbers are particularly sensitive pieces of personal information. With a stolen Social Security number, which is only one subset of the Private Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[61]

173. The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for

---

60 *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GOV'T ACCOUNTABILITY OFF. (July 5, 2007), https://www.gao.gov/assets/a262904.html (last visited July 9, 2026).

61 *See, e.g.*, Christine DiGangi, *5 Things an Identity Thief Can Do With Your Social Security Number*, YAHOO! (Feb. 17, 2015), https://finance.yahoo.com/news/5-things-identity-thief-social-113031894.html (last visited July 9, 2026).

unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.[62]

174. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[63]

175. This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like UMMC is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

---

[62] *Id.*

[63] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 9, 2026).

176. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[64] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[65]

177. The medical information, PHI, which was exposed is also highly valuable. PHI can sell for as much as $363 according to the Infosec Institute.[66]

178. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it.*

179. Identity theft is not an easy problem to solve. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[67] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

a. 77-percent experienced financial-related problems;

b. 29-percent experienced financial losses exceeding $10,000;

c. 40-percent were unable to pay bills;

d. 28-percent were turned down for credit or loans;

e. 37-percent became indebted;

f. 87-percent experienced feelings of anxiety;

g. 67-percent experienced difficulty sleeping; and

---

64 Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PC MAG. (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited July 9, 2026).

65 *Dark Web Monitoring: What You Should Know*, CONSUMER FED'N AM. (Mar. 19, 2019), https://nationalcybersecurity.com/what-you-should-know-%C2%B7-consumer-federation-of-america-deepweb/ (last visited July 9, 2026).

66 *Data Breaches: In the Healthcare Sector,* CTR. INTERNET SEC., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited July 9, 2026).

67 *2023 Consumer Impact Report*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited June 17, 2026).

h. 51-percent suffered from panic of anxiety attacks.[68]

180. Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of the SSN, and a new SSN will not be provided until after the victim has suffered the harm.

181. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Jim Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[69]

182. Theft of PII is even more serious when it includes theft of PHI. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

183. Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. According to Kaiser Health News, "medical-related identity theft accounted for 43

68 *Id.* at pp. 21-25.

69 Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last visited July 9, 2026).

percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[70] "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[71]

184. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[72] It is also more difficult to detect, taking victims "weeks, months, or even years," to detect.[73] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use Private Information to "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[74] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[75]

185. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

---

[70] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER HEALTH NEWS, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited July 9, 2026).

[71] *Id.*

[72] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/ (last visited July 9, 2026).

[73] *Id.*

[74] *What to Know About Medical Identity Theft*, FED. TRADE COMM'N, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited July 9, 2026).

[75] *Id.*

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

186. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

187. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[76]

188. Cybercriminals can post stolen Private Information on the cyber black-market for years following a data breach, thereby making such information publicly available.

189. Approximately 16% of victims do not realize their identity has been compromised until more than three years after it has happened.[77] This gives thieves ample time to seek multiple treatments under the victim's name. In 2014, 28% of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[78]

190. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[79]

191. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use that information for any number of improper purposes and scams, including making the information available for sale on the black market.

192. A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:

---

76 John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited July 9, 2026).

77 *Id*.

78 *Fifth Annual Study on Medical Identity Theft* at 11, PONEMON INSTITUTE, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf (last visited July 9, 2026).

79 *Id*. at 2.




193. Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.

194. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their Private Information exposed, have suffered harm, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

195. Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a. Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

b. Trespass, damage to, and theft of their personal property, including Private Information;

c. Improper disclosure of their Private Information;

d. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

e. The imminent and certainly impending risk of having their confidential medical information used against them by spam callers to defraud them;

f. Damages flowing from UMMC's untimely (and in some cases, non-existent) and inadequate notification of the Data Breach;

g. Loss of privacy suffered as a result of the Data Breach;

h. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

i. Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

j. The loss of use of and access to their credit, accounts, and/or funds;

k. Damage to their credit due to fraudulent use of their Private Information; and

l. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

196. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of UMMC, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. UMMC has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' Private Information.

197. Plaintiff and Class Members also have an interest in ensuring that their Private Information that was provided to UMMC is removed from UMMC's unencrypted files.

198. Given the kind of Private Information UMMC made accessible to hackers, Plaintiff is certain to incur damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[80] None of this should have happened.

199. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, UMMC knew or should have known about these dangers and strengthened its data security accordingly. UMMC was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### L. The Data Breach Was Foreseeable and Preventable

200. Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some

---

[80] *What happens if I change my Social Security number?*, LEXINGTON LAW (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html (last visited July 9, 2026).

of the biggest cybersecurity breaches: Target,[81] Yahoo,[82] Marriott International,[83] Chipotle, Chili's, Arby's,[84] and others.[85]

201. Companies providing services to the healthcare industry, such as UMMC, have been prime targets for cyberattacks. As early as August 2014, the FBI specifically warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[86]

202. UMMC should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

203. UMMC was clearly aware of the risks it was taking and the harm that could result from inadequate data security, and it could have prevented this Data Breach.

---

81 Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/ (last visited July 9, 2026).

82 Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html (last visited July 9, 2026).

83 Patrick Nohe, *Autopsying the Marriott Data Breach: This is why insurance matters*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last visited July 9, 2026).

84 Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b (last visited July 9, 2026).

85 *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html (last visited July 9, 2026).

86 *See FBI Warns Healthcare Firms, supra* note 51.

204. Data disclosures and data breaches are preventable.[87] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." *Id.* She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]" *Id.*

205. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*." *Id.*

206. In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[88] The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

87 Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson, ed., 2012).

88 *Protecting Personal Information: A Guide for Business*, *supra* note 22.

207. Upon information and belief, UMMC failed to maintain many reasonable industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, UMMC also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

208. In August 2022, the Consumer Finance Protection Bureau (CFPB) published a circular on data security. The CFPB noted that "[w]idespread data breaches and cyberattacks have resulted in significant harms to consumers, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for consumers' data can violate the prohibition on "unfair acts or practices" in the Consumer Finance Protection Act (CFPA).

209. Given that UMMC was storing the Private Information of several thousand individuals, UMMC could and should have implemented all of the above measures to prevent and detect ransomware attacks. These are basic, common-sense email security measures that every business, not only healthcare businesses, should be doing. UMMC, with its heightened standard of care, should be doing even more.

210. Specifically, among other failures, UMMC had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[89] Indeed, the United States Department of Health and Human

[89] *See, e.g.*, Adnan Raja, *How to Safeguard Your Business Data with Encryption*, DIGITAL

Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[90]

211. Charged with handling sensitive Private Information, including healthcare information, Defendant knew, or should have known, the importance of safeguarding its patients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on its patients after a breach. UMMC failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

212. With respect to training, Defendant specifically failed to:

a) Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

b) Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

c) Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

213. The Private Information was also maintained on UMMC's computer system in a condition vulnerable to cyberattacks, such as through the infiltration of Defendant's systems through ransomware attacks. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to UMMC, and

GUARDIAN (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption. (last visited July 9, 2026).

[90] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T HEALTH & HUM. SERVS. (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html (last visited July 9, 2026).

thus UMMC was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left it in a vulnerable position.

214. In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information.

215. Plaintiff and Class Members entrusted their Private Information to UMMC as a condition of receiving healthcare related services. Plaintiff and Class Members understood and expected that UMMC or anyone in UMMC's position would safeguard their Private Information against cyberattacks, delete or destroy Private Information that UMMC was no longer required to maintain, and timely and accurately notify them if their Private Information was compromised.

**M. The Monetary Value of Privacy Protections and Private Information**

216. The fact that Plaintiff's and Class Members' Private Information was stolen means that Class Members' Private Information is likely for sale by cybercriminals and will be misused in additional instances in the future. Indeed, there is already evidence that Plaintiff's Private Information is on the dark web.

217. At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

218. As discussed above, Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[91]

219. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

---

[91] *Warning Signs of Identity Theft*, FED. TRADE COMM'N (Sept. 2018), https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited July 9, 2026).

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[92]

220. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[93]

221. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[94]

222. Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a

---

[92] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 9, 2026).

[93] Rick Barrett, *Time Warner Cable Privacy Lawsuit Dismissed by Wisconsin Judge*, MILWAUKEE J. SENTINEL (June 19, 2016, at 11:00 PM CT), https://www.jsonline.com/story/money/business/2016/06/20/time-warner-cable-privacy-lawsuit-dismissed-by-wisconsin-judge/86168184 (last visited July 9, 2026).

[94] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 9, 2026).

profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

223. Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[95]

224. As discussed above, the value of Plaintiff's and Class Members' Private Information on the black market is substantial.

225. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment.

226. The ramifications of UMMC's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

227. Victims may not realize their identity has been compromised until long after it has happened.[96] This gives thieves ample time to seek multiple treatments under the victim's name. For instance, in 2014, 28% of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[97]

---

[95] Erika Harrell, *Victims of Identity Theft*, 2014, U.S. DEP'T JUSTICE (Nov. 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last visited July 9, 2026).

[96] *See* Coffey, *Difficulties in Determining Data Breach Impacts*, *supra* note 78.

[97] PONEMON INSTITUTE, *supra* note 80, at 11.

228. Breaches are particularly serious in healthcare industries, with healthcare related data among the most private and personally consequential, as set forth above.

229. At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

230. Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the ransomware attack into its systems and, ultimately, the theft of its patients' Private Information.

231. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[98] For example, different PII and PHI elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[99] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that was misused.

---

98 *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers* at 20, FED. TRADE COMM'N (March 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf (last visited July 9, 2026).

99 *See id* at 15-22 (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

232. In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

233. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information was not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

234. Given these facts, any healthcare or other type of entity that transacts business with patients or customers and then compromises the privacy of its patients' or customers' Private Information has thus deprived them of the full monetary value of the transaction with the entity.

235. In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

**N. The Data Breach's Impact on Plaintiff and Class Members**

236. UMMC received Plaintiff's and Class Members' PII/PHI in connection with providing them with medical services. In requesting and maintaining Plaintiff's PII/PHI for medical and/or business purposes, UMMC expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII/PHI. UMMC, however, did not take proper care of Plaintiff's PII/PHI, leading to its exposure to and exfiltration by cybercriminals as a direct result of UMMC's inadequate data security measures.

237. On February 19, 2026, UMMC announced that it had experienced a Data Breach which severely crippled its systems and compromised its patients' sensitive PII and PHI. The

Breach also caused severe disruptions to UMMC's electronic medical records, leading UMMC to cancel all outpatient and ambulatory surgeries and procedures.[100]

238. UMMC's conduct, which allowed the Data Breach to occur, caused Plaintiff significant injuries and harm, including but not limited to, the following—Plaintiff immediately devoted (and must continue to devote) time, energy, and money to: closely monitoring her medical statements, bills, records, and credit and financial accounts; changing login and password information on any sensitive account even more frequently than she already does; more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that she is not being targeted in a social engineering or spear phishing attack; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect herself; and placing fraud alerts and/or credit freezes on her credit file. Plaintiff has taken or will be forced to take these measures in order to mitigate her potential damages as a result of the Breach.

239. Once PII or PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years, and possibly her entire life.

240. Plaintiff greatly values her privacy, especially while receiving medical services. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for medical services, and instead received services that were of a diminished value to those described in their agreements with their respective healthcare institutions that had made agreements with UMMC for the benefit and protection of Plaintiff and Class Members and their respective Private Information. Plaintiff and Class Members were damaged in an amount at least equal to the

[100] University of Mississippi Medical Center, FACEBOOK (Feb. 19, 2026, at 8:45 AM CT), https://www.facebook.com/share/p/1DTzZv4QUd/.

difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

241. Plaintiff and Class Members would not have obtained medical services from UMMC, or paid the amount they did to receive such, had they known that UMMC would negligently fail to adequately protect their PII/PHI. Indeed, Plaintiff paid UMMC for medical services with the expectation that UMMC would keep her PII/PHI secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from their medical providers had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

242. Plaintiff and Class Members have lost confidence in their medical provider, UMMC, as a result of the Data Breach.

243. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff's and Class members' Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud.

244. Plaintiff is also at a continued risk of harm because her PII/PHI remains in UMMC systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as UMMC fails to undertake the necessary and appropriate data security measures to protect the PII and PHI in its possession.

245. As a result of the Data Breach, and in addition to the time Plaintiff has spent and anticipates spending to mitigate the impact of the Data Breach on her life, Plaintiff has also

suffered emotional distress from the public release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. The emotional distress she has experienced includes anxiety and stress resulting from the unauthorized bad actors viewing, selling, and misusing her PII and PHI for the purposes of identity theft and fraud.

246. Additionally, Plaintiff has suffered damage to and diminution in the value of her highly sensitive and confidential PII/PHI—a form of property that Plaintiff entrusted to UMMC and which was compromised as a result of the Data Breach UMMC failed to prevent. Plaintiff has also suffered a violation of her privacy rights as a result of UMMC's unauthorized disclosure of her PHI/PII.

247. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

248. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

249. Plaintiff brings all counts, as set forth below, individually and as a class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Nationwide Class defined as:

> All individuals in the United States who whose sensitive PII and PHI were compromised in the Data Breach, including individuals whose medical appointments and treatments were cancelled or postponed as a result of the Data Breach.

250. In the alternative to the foregoing Nationwide Class, Plaintiff seeks to represent the following Mississippi Subclass:

> All individuals in Mississippi who whose sensitive PII and PHI were compromised in the Data Breach.

251. Together, the Nationwide Class and the Mississippi Subclass are referred to as the "Class."

252. Excluded from the Class are UMMC's officers and directors; any entity in which UMMC has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of UMMC. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

253. Plaintiff reserves the right to amend or modify the Class or Class definitions as this case progresses.

254. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

255. **Numerosity, Fed. R. Civ. P. 23(a)(1)**: The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals who were or are patients of UMMC whose sensitive data was compromised in Data Breach.

256. **Commonality, Fed. R. Civ. P. 23(a)(2):** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether UMMC unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether UMMC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether UMMC's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d. Whether UMMC's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether UMMC owed a duty to Class Members to safeguard their Private Information;

f. Whether UMMC breached the duty to Class Members to safeguard their Private Information;

g. Whether UMMC knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether UMMC should have discovered the Data Breach sooner;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of UMMC's misconduct;

j. Whether UMMC's conduct was negligent;

k. Whether UMMC breached implied contracts with Plaintiff and Class Members;

l. Whether UMMC was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m. Whether UMMC failed to provide notice of the Data Breach in a timely manner; and

n. Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

257. **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Further, there are no defenses available to Defendant that are unique to Plaintiff.

258. **Adequacy of Representation, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions.

259. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

260. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for UMMC. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

261. UMMC has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

262. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether UMMC failed to timely and adequately notify the public of the Data Breach;

b. Whether UMMC owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether UMMC's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether UMMC's failure to institute adequate protective security measures amounted to negligence;

e. Whether UMMC failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

263. Finally, all members of the proposed Class are readily ascertainable. UMMC has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the State-wide Class)

264. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

265. UMMC required patients, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing healthcare services.

266. By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, UMMC owed a duty of care to use reasonable means to secure and safeguard its computer system—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. UMMC's duty included a responsibility to implement processes by which it could detect a breach of its security

systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

267. UMMC owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

268. Plaintiff and the Class are a well-defined, foreseeable, and probable group of patients that UMMC was aware, or should have been aware, could be injured by inadequate data security measures.

269. UMMC owed numerous duties to Plaintiff and the Class, including the following:

- To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;
- To protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and
- To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

270. A large depository of highly valuable health care information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. UMMC knew or should have known that, given its repository of a host of Private Information for hundreds of thousands of patients posed a significant risk of being targeted for a data breach. Furthermore, UMMC was advised of this risk by OCR after the data security incident in 2013. Thus, UMMC had a duty to reasonably safeguard its patients' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the Private Information.

271. UMMC's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between UMMC and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. UMMC was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

272. UMMC's duty to use reasonable security measures under HIPAA required UMMC to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

273. In addition, UMMC has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

274. UMMC's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because UMMC is bound by industry standards to protect confidential Private Information.

275. UMMC breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by UMMC include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to ensure that their email system had plans in place to maintain reasonable data security safeguards;

d. Failing to have in place mitigation policies and procedures;

e. Allowing unauthorized access to Class Members' Private Information;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

276. It was foreseeable that UMMC's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry, and given UMMC's own security breach in 2013 affecting the PII and PHI of thousands of patients.

277. UMMC's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

278. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

279. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged above.

280. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

281. Plaintiff and Class Members are also entitled to injunctive relief requiring UMMC to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future

annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the Mississippi Subclass)**

282. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

283. Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, UMMC had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

284. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, UMMC had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

285. Pursuant to HIPAA, UMMC had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

286. Pursuant to the HIPAA Breach Notification Rule, 45 CFR §§ 164.400, *et seq.*, UMMC had a duty to report the Data Breach to HHS within 60 days of its discovery, and breached this duty by failing to do so.

287. UMMC breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

288. UMMC's failure to comply with applicable laws and regulations constitutes negligence per se.

289. But for UMMC's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

290. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of UMMC's breach of its duties. UMMC knew or should have known that it was failing to meet its duties, and that UMMC's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

291. As a direct and proximate result of UMMC's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the Mississippi Subclass)

292. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

293. Plaintiff and the Class Members entered into implied contracts with UMMC under which UMMC agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

294. Plaintiff and the Class were required to and did deliver their Private Information to UMMC as part of the process of obtaining services provided by UMMC. Plaintiff and Class Members paid money, or money was paid on their behalf, to UMMC in exchange for services.

295. UMMC solicited, offered, and invited Class Members to provide their Private Information as part of UMMC's regular business practices. Plaintiff and Class Members accepted UMMC's offers and provided their Private Information to UMMC.

296. UMMC accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services for Plaintiff and Class Members.

297. In accepting such information and payment for services, UMMC entered into an implied contract with Plaintiff and the other Class Members whereby UMMC became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

298. In delivering their Private Information to UMMC and paying for healthcare services, Plaintiff and Class Members intended and understood that UMMC would adequately safeguard the data as part of that service.

299. Upon information and belief, in its written policies, UMMC expressly and impliedly promised to Plaintiff and Class Members that they would only disclose protected information and other Private Information under certain circumstances, none of which related to a Data Breach as occurred in this matter.

300. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

301. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified

and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

302. Plaintiff and the Class Members would not have entrusted their Private Information to UMMC in the absence of such an implied contract.

303. Had UMMC disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their sensitive Private Information to UMMC.

304. UMMC recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

305. Plaintiff and the other Class Members fully performed their obligations under the implied contracts with UMMC.

306. UMMC breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

307. As a direct and proximate result of UMMC's conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT IV
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the Mississippi Subclass)

308. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

309. This count is pleaded in the alternative to Count III (breach of implied contract).

310. Upon information and belief, UMMC funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

311. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to UMMC.

312. Plaintiff and Class Members conferred a monetary benefit on UMMC. Specifically, they purchased goods and services from UMMC and/or its agents and in so doing provided UMMC with their Private Information. In exchange, Plaintiff and Class Members should have received from UMMC the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

313. UMMC knew that Plaintiff and Class Members conferred a benefit which UMMC accepted. UMMC profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

314. Plaintiff and Class Members conferred a monetary benefit on UMMC, by paying UMMC as part of rendering medical services, a portion of which was to have been used for data security measures to secure Plaintiff's and Class Members' Private Information, and by providing UMMC with their valuable Private Information.

315. UMMC was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, UMMC compromised the Private Information entrusted to it at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of UMMC's failure to provide the requisite security.

316. Under the principles of equity and good conscience, UMMC should not be permitted to retain the money belonging to Plaintiff and Class Members, because UMMC failed to implement appropriate data management and security measures that are mandated by industry standards.

317. UMMC acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

318. If Plaintiff and Class Members knew that UMMC had not secured their Private Information, they would not have agreed to provide their Private Information to UMMC.

319. Plaintiff and Class Members have no adequate remedy at law.

320. As a direct and proximate result of UMMC's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in UMMC's possession and is subject to further unauthorized disclosures so long as UMMC fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

321. As a direct and proximate result of UMMC's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

322. UMMC should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, UMMC should be compelled to refund the amounts that Plaintiff and Class Members overpaid for UMMC's services.

## COUNT V
## BREACH OF FIDUCIARY DUTY
## (On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the Mississippi Subclass)

323. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

324. In light of the special relationship between UMMC and Plaintiff and Class Members, UMMC became a fiduciary by undertaking a guardianship of Plaintiff's and Class Members' Private Information, and to act primarily for the benefit of Plaintiff and Class Members, including by (1) safeguarding Plaintiff's and Class Members' Private Information; (2) timely notifying Plaintiff and Class Members in the event of a data breach and disclosure; and (3) maintaining complete and accurate records of what information (and where) UMMC stores.

325. UMMC had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its patients, in particular, to keep secure their Private Information.

326. UMMC breached its fiduciary duty to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

327. UMMC breached its fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

328. UMMC breached its fiduciary duty owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

329. UMMC breached its fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

330. As a direct and proximate result of UMMC's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in UMMC's possession and is subject to further unauthorized disclosures so long as UMMC fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of UMMC's services they received.

331. As a direct and proximate result of UMMC's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VI**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the Mississippi Subclass)**

332. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

333. Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

334. As a healthcare provider, Defendant has a special relationship to its patients, like Plaintiff and the Class Members.

335. Because of that special relationship, Defendant was provided with and stored private and valuable PII and PHI belonging to Plaintiff and the Class, which it was required to maintain in confidence.

336. Plaintiff and the Class provided Defendant with their Private Information under both the express and/or implied agreement of Defendant to limit the use and disclosure of such Private Information.

337. Defendant had a common law duty to maintain the confidentiality of Plaintiff's and Class Members' Private Information.

338. Defendant owed a duty to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

339. Plaintiff and Class Members have a privacy interest in their personal and medical matters, and Defendant had a duty not to disclose confidential personal and medical information and records concerning its patients.

340. As a result of the parties' relationship of trust, Defendant had possession and knowledge of the confidential Private Information of Plaintiff and Class Members.

341. Plaintiff's and the Class's Private Information is not generally known to the public and is confidential by nature.

342. Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

343. Defendant breached the duty of confidence it owed to Plaintiff and Class Members when Plaintiff's and Class's Private Information was disclosed to unknown criminal hackers by way of Defendant's own acts and omissions, as alleged herein.

344. Defendant breached its duties of confidence by failing to safeguard Plaintiff's and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; (h) storing PII, PHI and medical

records/information in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiff's and the Class Members' Private Information to a criminal third party.

345. But for Defendant's wrongful breach of its duty of confidences owed to Plaintiff and Class Members, their privacy, confidences, and Private Information would not have been compromised.

346. As a direct and proximate result of Defendant's breach of Plaintiff's and the Class's confidences, Plaintiff and Class Members have suffered or will continue to suffer injuries, including: (a) the erosion of the essential and confidential relationship between Defendant—as a health care services provider—and Plaintiff and Class Members as patients; (b) loss of their privacy and confidentiality in their Private Information; (c) theft of their Private Information; (d) costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; costs associated with purchasing credit monitoring and identity theft protection services; (e) lowered credit scores resulting from credit inquiries following fraudulent activities; (f) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant's Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; (g) the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; (h) damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class

Members' data against theft and not allow access and misuse of their data by others; (i) continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; (j) loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received, as directed to do by Defendant; (k) and/or mental anguish accompanying the loss of confidences and disclosure of their confidential Private Information.

347. Additionally, Plaintiff and Class Members made payments to Defendant for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiff's and Class Members' Private Information.

348. Defendant breached the confidence of Plaintiff and Class Members when it made an unauthorized release and disclosure of their confidential Private Information and, accordingly, it would be inequitable for Defendant to retain the benefit at Plaintiff's and Class Members' expense.

349. As a direct and proximate result of Defendant's breach of confidences, Plaintiff and Class Members are entitled to damages, including compensatory and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT VII
## DECLARATORY RELIEF
**(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the Mississippi Subclass)**

350. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 263 above as if fully set forth herein.

351. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

352. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that additional compromises of their Private Information will occur in the future.

353. The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect its patients' PII and PHI.

354. Defendant still possesses the Private Information of Plaintiff and the Class.

355. Defendant has made no announcement that it has changed its data storage or security practices relating to the storage of Plaintiff's and Class Members' Private Information.

356. To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

357. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at UMMC. The risk of another such breach is real, immediate, and substantial.

358. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at UMMC, Plaintiff and Class Members will likely continue to be subjected to a heightened,

substantial, imminent risk of fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

359. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at UMMC, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other patients whose Private Information would be further compromised.

360. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that UMMC implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on UMMC's systems on a periodic basis, and ordering UMMC to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Purging, deleting, and destroying Private Information not necessary for UMMC's provisions of services in a reasonably secure manner;

e. Conducting regular database scans and security checks; and

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

B. For equitable relief enjoining UMMC from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling UMMC to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of UMMC's wrongful conduct;

E. Ordering UMMC to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of costs and any other expense, including expert witness fees;

H. Post-judgment interest on any amounts awarded; and

I. Such other and further relief as this court may deem just and proper.

Dated: July 21, 2026

Respectfully submitted,

*/s/ Michael V. Cory, Jr.*
Michael V. Cory, Jr. (MB#9868)
213 South Lamar Street
Jackson, MS 39201
P.O Box 1759
T: 601-957-3101
mc@dmclaw.net

**SHUB JOHNS & HOLBROOK LLP**
Benjamin F. Johns (*pro hac vice* forthcoming)
Samantha E. Holbrook (*pro hac vice* forthcoming)
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
T: (610) 477-8380
bjohns@shublawyers.com
sholbrook@shublawyers.com

**AHDOOT WOLFSON PC**
Andrew W. Ferich (*pro hac vice* forthcoming)
201 King of Prussia Road, Suite 650
Radnor, PA 19087
T: (310) 474-9111
aferich@ahdootwolfson.com

**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
Jonathan S. Mann (*pro hac vice* forthcoming)
2001 Park Place North, Suite 1100
Birmingham, AL 35203
T: (205) 322-8800
jonm@pittmandutton.com

*Attorneys for Plaintiff and the Putative Class*